## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**LEE ET AL**

**VERSUS**

**HOOD CONTAINER OF LOUISIANA, LLC**

**CIVIL ACTION**

**NO. 23-219-JWD-RLB**

## RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 40) filed by Defendant Hood Container of Louisiana, LLC ("Defendant"). Plaintiffs Michael Lee ("Plaintiff" or "Lee") and Susan Broadway Lee ("Mrs. Lee" or "Broadway Lee") oppose the *Motion for Summary Judgment* in *Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment* (Doc. 53). Defendant then filed its *Reply in Support of Motion for Summary Judgment* (Doc. 61). For the reasons stated below, the Court grants the *Motion for Summary Judgment*.

## I.    BACKGROUND

The parties agree that Lee was employed by Defendant Hood at a papermill in St. Francisville, Louisiana, from June 14, 2010, until May 2, 2022. (Doc. 21 at ¶¶ 3, 7; Doc. 40-1 at ¶¶ 1–2.) Likewise, they agree that Defendant had an annually scheduled outage or turnaround ongoing on April 24, 2022, which required shutting down the papermill for cleaning and repairs. (Doc. 40-1 at ¶¶ 3, 6; Doc. 53 at 1.) As part of the outage, Defendant brought in third-party contractor American Environmental, Inc. ("American Environmental") to do some amount of the cleaning. (Doc. 40-1 at ¶ 5; Doc. 21 at ¶ 10.) American Environmental would mark off their work area with red tape to mark the danger posed by their cleaning. (Doc. 40-1 at ¶ 8; Doc. 21 at ¶ 10.) However, the parties largely dispute the other relevant details.

1

Plaintiffs claim that from June 14, 2010, until May 2, 2022, Mr. Lee was an employee at a papermill in St. Francisville, Louisiana, that is owned and operated by Defendant. (Doc. 21 at ¶¶ 3, 7.) On April 24, 2022, Plaintiffs allege, Mr. Lee and a co-worker were ordered by their foreman, Kyle Haygood ("Haygood") to clean a chemical tank at the papermill, which required draining the tank and washing out the "mud" or "the mixture of lime and caustic substances that build up inside the tank throughout the year." (*Id.* at ¶ 8.) Plaintiffs assert that at the time Lee and his co-worker were ordered to clean out the tank, the area around the tank had been taped off by a crew of contractors from American Environmental for hydroblasting and marked as unsafe to enter. (*Id.* at ¶ 10.) According to Lee, an American Environmental employee had been severely injured by the hydroblaster's spray at the papermill approximately three years earlier. (*Id.* at ¶ 11.) As a result, Lee was aware of dangers associated with the hydroblaster. (*Id.*)

In addition, Lee asserts that the hydroblaster in use on April 24, 2022, was using as its water source the same firehose that Lee would have needed to clean out the tank. (*Id.*) Plaintiffs claim that Lee reported the danger to Haygood immediately, but Haygood ordered Lee and his co-worker to clean the tank with a pressure-washer regardless. (*Id.* at ¶ 10.) Lee contends that he pointed out the red tape and asked that the assignment "be deferred" to "commence after the hydroblaster crew had finished their work in the area around the tank." (*Id.* at ¶ 12.) Despite this, Lee says, Haygood ordered him "to ignore the hydroblaster crew, bypass the red hazard tape, and enter the tank with a pressure washer[]" as an alternative to the firehose he would typically use, since the hydroblaster was using the firehose. (*Id.* at ¶ 13.)

Plaintiffs state that "Mr. Lee reluctantly agreed to comply with Mr. Haygood's orders[]" and began cleaning the tank, which required him pulling the pressure washer "through a manhole and through two feet of mud." (*Id.* at ¶ 14.) "In doing so, Mr. Lee reaggravated a shoulder injury

he had suffered a few months before at Hood Container's facility." (*Id.*) According to Plaintiffs, the previous injury had been diagnosed as a shoulder strain, for which Mr. Lee had seen the company doctor. (*Id.*) Lee asserts that he continued to try to clean out the tank while the hydroblaster crew sprayed the mud drum ("mud filter room") above. (*Id.* at ¶ 15.) At some point, Lee claims, the debris from the hydroblaster clogged a drainpipe hear where he was working. (*Id.*) "Maintenance remedied the clogged drainpipe by cutting the pipe immediately above the area of blockage[,]" which Plaintiffs assert "left the exposed end of the drainpipe pointing directly at the area in which Mr. Lee and Mr. Knight were working, at about their chest/head level." (*Id.*) According to Lee, when the hydroblaster crew resumed work, "nuts bolts, metal debris, waste, and other projectiles" were pushed down that drainpipe and shot out at Lee "at a very high and unsafe velocity." (*Id.* at ¶ 16.) Lee claims that he "ceased working and reported the increasingly more dangerous conditions to his supervisor, Mr. Haygood." (*Id.*) Lee asserts that he again informed Haygood "that the job could not be safely performed under these conditions[,]" and that Haygood at this point agreed. (*Id.* at ¶ 17.) Lee also informed Haygood of his reaggravated shoulder injury and asked if he could take the rest of the day off, which he was permitted to do. (*Id.*)

At home, Lee claims that his "shoulder pain grew more intense throughout the day[,]" leading him to "call[] his employer and request[] two days off to heal[.]" (*Id.* at ¶ 18.) He then returned to work on April 29, 2022. (*Id.*) At that point, Lee asserts, a supervisor, Ryan Al-Marhoun ("Al-Marhoun") met with him to ask why he had not completed cleaning the tank. (*Id.* at ¶ 19.) Lee claims that he again explained "the unsafe conditions that were present" and informed Al-Marhoun "that the job could not be safely performed until the dangers were removed." (*Id.*) However, according to Lee, Al-Marhoun reprimanded him and told him that "as a seasoned employee, Mr. Lee's objections to work assignments would set a bad example to the rest of the

labor force at the papermill." (*Id.* at ¶ 20.) Lee claims that he "stressed that he was not objecting to the work assignment but instead was seeking a safer environment before continuing with the assigned task." (*Id.*) After this meeting, Lee asserts that he was sent back to work and "worked the next three days without event." (*Id.*)

On May 2, 2022, however, Lee was terminated "for job abandonment and insubordination." (*Id.* at ¶ 21.) He asked to explain his side of the story to the human resources representative and, upon completing his explanation, "the human resources representative stated that this was the third version of events that she had heard." (*Id.*) The official cause of separation listed in Mr. Lee's Notice of Separation was "Violation of company policy/Job Abandonment." (Doc. 61-2 at 1.)

Defendant, on the other hand, asserts that American Environmental annually "clean[ed] the Mud Filter Room while the Operators clean[ed] the Mud Storage Tank." (Doc. 40-1 at ¶ 5.) Defendant claims that the tank was outside of the red danger tape and that every year, the two were cleaned at the same time. (*Id.* at ¶ 9.) It asserts that the tape did not "include nor did it restrict entry into the manway entrance of the Mud Storage Tank." (*Id.* at ¶ 10.) Defendant further claims that there are no drains that "American Environmental cleans in the Mud Filter Room [that] exit in the vicinity of the Mud Storage Tank." (*Id.* at ¶ 11.)  According to Defendant, "[w]hile cleaning the Mud Storage Tank, Mr. Lee tweaked his shoulder and decided to take a lunch break." (*Id.* at ¶ 13.) During this lunch break, "Mr. Lee told his superior, Mr. Haygood, that cleaning the tank by himself was 'some bullshit,' that he 're-tweaked [his] shoulder,' and it was best if he went home." (*Id.* at ¶ 14.) It claims that he "left the Paper Mill early without permission on April 24, 2022[,]" and that evening, "called the attendance line to report that he would be absent from work for the next two scheduled days due to sickness[.]" (*Id.* at ¶¶ 15–16.) By the time Lee returned on April 29, 2022, it was the last day of the outage and the tank had been cleaned. (*Id.* at ¶¶ 16–17.)

4

According to Defendant, when Lee discussed the incident with Al-Marhoun, he informed Al-Marhoun "that cleaning the Mud Storage Tank with a new employee on his day off was 'B.S.' as he believed it was 'grunt' and 'busy' work that the hydro-blasters should have done, not him." (*Id.* at ¶ 18.) Defendant asserts that Plaintiff at no point during this conversation nor on April 24th did Plaintiff raise safety concerns. (*Id.* at ¶ 19.) As per Defendant, an investigation by Al-Marhoun led him to conclude that Lee had "walked of the job without permission and should be terminated for insubordination and job abandonment." (*Id.* at ¶ 20.) Plaintiff was then terminated on May 2, 2022. (*Id.* at ¶ 21.)

## II.    PARTIES' ARGUMENTS

### A.    Defendant's Motion to Dismiss (Doc. 40)

Defendant argues that Plaintiffs have failed to meet their summary judgment burden of showing any genuine dispute of material fact. (Doc. 40-2 at 11.) Instead, it argues, Plaintiffs' claim under the Louisiana Whistleblower Statute is unsupported by the evidence, which they argue "shows Hood terminated Mr. Lee because he refused to do his job and left work in the middle of his shift." (*Id.* at 12.) Defendant asserts that while the "Whistleblower Statute protects employees against reprisal from employees for reporting or refusing to participate in illegal work practices[,]" Plaintiffs have failed to show evidence of the necessary elements for a Louisiana Whistleblower Statute claim. (*Id.*)

First, it contends, Lee has not provided evidence that Defendant violated any state laws. (*Id.*) Defendant argues that Plaintiffs' claim that Defendant violated La. R.S. § 23:13 fails because "La. R.S. § 23:13 is a negligence-based claim and is thus barred by the Louisiana Workers' Compensation Act." (*Id.* at 13.) It argues that § 23:1032 of the Louisiana Worker's Compensation Act ("LWCA") "specifically excludes employees from bringing claims under § 23:13." (*Id.*) As a

result, Defendant argues, "even if" everything the Plaintiffs allege is true, they have no relief under § 23:13. (*Id.*) Defendant points to the Western District of Louisiana's reasoning in *Boswell v. Rosemont Realty*, stating that "[t]he Louisiana Worker's Compensation act is an employee's exclusive remedy for work-related injuries, precluding civil liability, except for injuries resulting from intentional acts' and Section 23:13 'is a negligence-based claim, thus excluding employees from bringing claims under § 23:13[.]'" (*Id.* at 14 (citing *Boswell v. Rosemont Realty*, No. 14-3183, 2015 U.S. Dist. LEXIS 65466, at *16 (W.D. La. Apr. 6, 2015)).)

Likewise, Defendant argues that Plaintiffs have no evidence to support their claims that Defendant violated La. R.S. §§ 14:34–37. (*Id.*) It asserts that although Lee asserts claims for damages under the Louisiana Whistleblower Statute due to violations of these statutes "'by effectively causing nuts, bolts, metal debris and other projectiles to be shot at Mr. Lee at a very high and unsafe velocity[,]'" (*id.* at 15 (quoting Doc. 16-2 at 7)), "these statutes are criminal statutes and are therefore improperly asserted against Hood in a civil proceeding." (*Id.*) Moreover, even if these were allegations of civil violations of intentional torts of battery and assault rather than criminal offenses, Defendant contends that they would still fail. (*Id.*) Defendant argues that "Plaintiffs actually claim another company, American Environmental, committed the alleged acts, not Hood." (*Id.*) In addition, Defendant argues, "there is no evidence to suggest Hood 'intended to cause' the battery or assault." (*Id.*) As a result, Defendant argues, it cannot be held civilly liable, because "'[c]ivilly, "an employer's actions in providing poor working conditions are not intentional."'" (*Id.* (quoting Doc. 20 at 3 (quoting *Batiste v. Bayou Steel Corp.*, 2010-1561 (La. 10/1/10), 45 So. 3d 167, 169)).)

Next, Defendant argues that there is no evidence that Lee notified Hood that it was in violation of any state law prior to his termination. (*Id.* at 16.) Defendant asserts that Lee is only

entitled to protection under the Louisiana Whistleblower Statute if he shows that he faced reprisals from his employer "'*based solely upon an employee's knowledge of an illegal workplace practice and his refusal to participate in the practice or intention to report it.*'" (*Id.* (quoting *Stuntz v. Wright Enrichment*, No. 6:20-cv-00182, 2020 WL 5989176, at *7 (W.D. La. Sep. 9, 2020) (quoting *Hale v. Touro Infirmary*, 2004-0003 (La. App. 4 Cir. 11/3/04), 886 So. 2d 1210, 1215) (emphasis added in *Motion for Summary Judgment*)).) Defendant argues that "there is no evidence that Mr. Lee informed Hood it was violating any state law before he was terminated[,]" nor that he "refused to participate in any illegal act or that he was terminated for refusing to participate in some illegal act[,]" nor that he "ever told anyone at Hood he was going to report Hood for some alleged illegal activity prior to his termination." (*Id.* at 18.) Instead, Defendant argues, the evidence demonstrates only "that Mr. Lee was terminated because he left his job in the middle of his shift without permission." (*Id.*)

Defendant further argues that a plaintiff asserting a claim under the Louisiana Whistleblower Statute has to show that he was aware that the workplace practice in question was in violation of state law when he refused to participate in it, and that Lee has not done so. (*Id.* at 16.) It argues that "[s]imply being aware of an alleged danger is not sufficient[,]" and that Plaintiff must instead have been aware of the illegality of his employer's actions." (*Id.*) Again, Defendant asserts that Plaintiff never informed Defendant that he was refusing to clean the tank or leaving work because of an illegal act, but instead that he was leaving due to his injured shoulder. (*Id.* at 18.)

Finally, Defendant argues that Plaintiffs' claims for loss of consortium and mental anguish must be dismissed as derivative claims since, Defendant contends, the primary claim under the Louisiana Whistleblower Statute is not supported by the evidence. (*Id.*)

7

B.    Plaintiffs' *Opposition* (Doc. 53)

Plaintiffs argue that Defendant misstates the Louisiana Whistleblower Statute. (Doc. 53 at 10.) They argue that "Defendant improperly narrows the statute by erroneously asserting that Plaintiff must prove both that he reported a violation of state law and that he refused to participate in an illegal act[,]" instead asserting that "[t]he statute clearly protects employees under **either** condition." (*Id.*) They argue that the statute protects "employees who either disclose illegal practices or decline[] to engage in them[.]" (*Id.* at 12.) Plaintiffs contend that when Lee "repeatedly raised safety concerns in person on the day of the incident in question" and again "to Mr. Ryan Al-Marhoun via text message on May 2, 2022[,]" he was "declin[ing] to continue working under unsafe conditions that violated state law, including La. R.S. § 23:13, which imposes a duty on employers to provide a reasonably safe workplace." (*Id.*) Plaintiffs argue that they have provided evidence that Lee raised safety concerns, and that his text message on the day of his termination references earlier conversations. (*Id.* at 12–13.) Plaintiffs further contend that Lee's refusal to work in these unsafe work conditions, although characterized as insubordination, was a "refusal to perform work due to the safety hazards involved[,]" particularly after those hazards resulted in injury. (*Id.* at 15.)

In addition, Plaintiffs assert, "there is no formal policy for leave[]" other than informing the employee's direct supervisor, which Plaintiffs contend Lee did by speaking to Haygood. (*Id.*) They argue that this undermines the charge of job abandonment and demonstrates the inconsistency of Defendant's arguments. (*Id.*) Likewise, Plaintiffs point to inconsistencies between statements from Haygood and another Hood employee, Thomas Carter, who disagreed in their depositions as to whether the entrance to the tank was taped off with red tape. (*Id.* at 16.) Plaintiffs argue that Haygood's credibility is undermined by his characterization of the tape surrounding the

area as "caution tape" rather than "red danger tape" and that there are, therefore, genuine issues of material fact as to this and as to "Defendant's representation of safety measures[.]" (*Id.*)

Plaintiffs further argue that there are genuine issues of material fact as to the unsafe working conditions stemming not only from Lee's testimony, but also from the testimony of multiple other witnesses addressing the dangers of the hydroblasting and "Hood's history of safety lapses[.]" (*Id.*) Plaintiffs assert that these "raise genuine disputes as to whether Hood violated La. R.S. § 23:13, which mandates that employers provide reasonably safe working conditions." (*Id.* at 16–17.) As a result, Plaintiffs argue, the Court cannot grant Defendant's motion for summary judgment. (*Id.* at 17.)

Plaintiffs further argue that Defendant's termination of Lee was retaliatory, contending that the proffered reasons "are clearly false and pretextual." (*Id.*) They point to what they deem "shifting explanations" for Lee's termination, as well as to the timing of his termination. (*Id.*)

Plaintiffs then argue that Defendant has misstated the exclusivity provision of the LWCA, asserting that "Defendant's argument is incorrect as a matter of law." (*Id.* at 17.) They point to decisions from the Louisiana Supreme Court, the Louisiana Second Circuit, and the Louisiana Fourth Circuit which, they claim, all rejected similar defenses. (*Id.* at 17–20 (citing *Cox v. Glazer Steel Corp.*, 606 So.2d 518 (La. 1982); *Morris & Dickson Co. v. Killingworth*, 36117 (La. App. 2 Cir. 10/04/02), 830 So. 2d 332; *Ruffin v. Poland Ent., LLC*, 06-0244 (La. App. 4 Cir. 12/13/06), 946 So. 2d 695; and *Watters v. Dep't. of Soc. Servs.*, 2008-0977 (La. App. 4 Cir. 06/17/09), 15 So. 3d 1128).)

In conclusion, Plaintiffs argue, there are material issues of fact as to whether Lee was subjected to unsafe working conditions and terminated in retaliation for raising concerns as to those working conditions and refusing "to perform unsafe and illegal acts." (*Id.* at 20.)

C.    **Defendant's *Reply* (Doc. 61)**

In its *Reply*, Defendant argues that "Plaintiff's Opposition is merely an attempt to throw as much spaghetti at the wall as possible in hopes that something sticks." (Doc. 61 at 5.) It contends that "the only admissible evidence Plaintiffs put forward that actually supports their claims is Mr. Lee's own self-serving testimony[,]" which, it argues, is not enough to prevent summary judgment and fails to establish a *prima facie* case regardless. (*Id.*)

Defendant asserts that "[Mr. Lee] must show, among other things, 'that [Hood] engaged in workplace conduct constituting an actual violation of state law,' and that [he] notified [Hood] of the state law violation." (*Id.* at 6 (quoting *Jones v. Wells Fargo Bank, N.A.*, No. 17-8712, 2019 WL 4601602 at *13 (E.D. La. 2019) (citing *Hale*, 886 So. 2d at 1216); citing *Diaz v. Superior Energy Servs., LLC*, No. 07-2805, 2008 WL 3077071 at *8 (E.D. La. 2008)) (alterations made in Defendant's *Reply*).)

Defendant reiterates its argument that Plaintiffs have failed "to establish an actual violation of La. R.S. 23:13[,]" arguing that Plaintiffs' claim is barred by the LWCA and that Plaintiffs have failed to show any evidence of an actual violation. (*Id.*) It again argues that the LWCA is the exclusive remedy for claims against one's employer, and that absent an intentional act, Plaintiffs' claims are not exempt from the LWCA. (*Id.* at 6–7.) Likewise, it distinguishes cases involving the occupational disease component of the LWCA, arguing that unlike in those cases, "Plaintiffs' allegations regarding the alleged safety hazards are 'characteristic of and peculiar to' the work Mr. Lee performed and fall squarely within the LWCA." (*Id.* at 8.) Defendant argues that allowing Plaintiffs' claims to go forward would open the floodgates to similar litigation. (*Id.*)

Next, Defendant argues, even if the Court did allow Plaintiffs' claims to proceed, they still have not established sufficient evidence to survive summary judgment. (*Id.* at 9.) Defendant asserts

that Plaintiffs must show that Hood actually violated state law and that Plaintiff knew that Hood was violating state law at the time of the incident. (*Id.*) Defendant argues that "Plaintiffs were required to come forward with evidence that (1) Hood's 'substandard conduct was a cause-in-fact of the plaintiff's injuries;' (2) Hood 'owed a duty to the plaintiff;' (3) 'a breach of the duty;' (4) Hood's 'substandard conduct was the legal cause of the plaintiff's injuries;' and (5) 'damages.'" (*Id.* (quoting *Watters*, 15 So. 3d at 1142).) Defendant contends that Plaintiffs have not shown or even alleged that Lee was injured as a result of alleged safety hazards, nor that they were caused by an unreasonable risk of harm due to Hood's failure to meet its duties under La. R.S. 23:13. (*Id.* at 10.) They urge the Court to dismiss Plaintiffs' claims on these grounds.

Next, Defendant argues, Plaintiffs have offered nothing but Lee's "own self-serving testimony" to show that Hood "created an unreasonable risk of injury or harm" in violation of La. R.S. 23:13. (*Id.*) It argues that Plaintiff attempts to rely on the testimony of two individuals who were not present at the time of the incident. (*Id.* at 10–11.) Defendant contends that Lee's own testimony establishes that "he was not at any risk of injury or harm[,]" since he testified that "he was working inside an enclosed tank, and the allege debris was hitting the tank, not him." (*Id.* at 11.) Likewise, Defendant argues, Lee "confirmed that he was wearing the required personal protective equipment," which Defendant contends demonstrates that "Hood provided Mr. Lee with the 'safety devices and safeguards' contemplated by La. R.S. 23:13[.]" (*Id.*) Consequently, it asserts, "no reasonable juror could conclude that Mr. Lee was exposed to an unreasonable risk of injury or harm." (*Id.*) It further argues that Plaintiffs have not "put forth evidence that Hood did anything outside the 'accepted and approved practices in such or similar industr[ies] or places of employment considering the normal hazards of such employment.'" (*Id.* (quoting La. R.S. 23:13).) Defendant argues that Plaintiff must show an actual violation of state law using the duty-risk

analysis, not merely a belief that Defendant was violating state law. (*Id.* at 12–15.) Defendant points to the OSHA review of Lee's termination, in which OSHA determined that the reason for Lee's termination was "walk[ing] off the job on April 24, 2022; not for engaging in safety and health protected activity." (*Id.* at 14 (citing Doc. 61-1).)

Defendant further asserts that Plaintiffs have failed to establish "that Mr. Lee advised Hood that it was violating a specific state law[,]" arguing that "generalized remarks about safety concerns are not sufficient." (*Id.* at 15.) It contends that "at best, he thought Hood was violating its own internal policies or OSHA standards but not any state law." (*Id.*) Defendants assert that the Louisiana Whistleblower Statute "is designed to protect only employees who are retaliated against for reporting a violation of state law." (*Id.*) It argues that "[a]lthough Mr. Lee claims he reported general safety concerns to Hood, Plaintiffs failed to provide any evidence that Mr. Lee knew the activity violated state law and that he reported the state law violation to Hood." (*Id.*)

Finally, Defendant argues that Plaintiffs have failed "to show that Hood fired Mr. Lee because he refused to participate in or threatened to disclose some unlawful practice." (*Id.* at 16.) It maintains that Hood has "presented evidence that it fired Mr. Lee for insubordination and job abandonment[,]" and that Plaintiff has not offered any "evidence to prove that Mr. Lee would have been fired absent those circumstances." (*Id.*) Consequently, Defendant argues, Plaintiffs have failed to meet their summary judgment burden.

## III.   LEGAL STANDARDS

### A.    Motion for Summary Judgment

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure, which states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pioneer Expl., L.L.C. v. Steadfast Ins. Co*., 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

However, "the movant 'need not negate the elements of the nonmovant's case.'" *Id*. (quoting *Boudreaux v. Swift Transp. Co*., 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc))). That is, "[a] movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C*., 915 F.3d 987, 997 (5th Cir. 2019) (citing *Celotex Corp*., 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.") (emphasis in original)). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." Id. (quoting *Stahl v. Novartis Pharms. Corp*., 283 F.3d 254, 263 (5th Cir. 2002) (internal quotation marks omitted)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts... [T]he nonmoving party must come forward with specific facts showing that there is a genuine

issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (cleaned up). The non-mover's "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (cleaned up).

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (cleaned up).

### B.    Louisiana Whistleblower Statute

Louisiana Revised Statute 23:967 provides:

> A. An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
> (1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
> (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
> (3) Objects to or refuses to participate in an employment act or practice that is in violation of law.

"Louisiana's Whistleblower Act forbids retaliation when [an] employee 'in good faith, and after advising the employer of the violation ..., [d]iscloses or threatens to disclose a workplace act or practice that is in violation of state law.'" *Williams v. Genesis Energy, LLC*, No. CV 20-35, 2021 WL 1227873 at *9 (M.D. La. Mar. 31, 2021) (citing *Herster v. Bd. of Sup'rs of Louisiana State Univ.*, 72 F. Supp. 3d 627, 647 (M.D. La. 2014)). The Court "has recognized that:

> The Act has five elements: 1) a workplace act or practice violates state law, 2) the employee informed his employer of the violation of state law, 3) the employee disclosed or threatened to disclose the violation, 4) the employee suffered an adverse employment action, and 5) the adverse employment action was suffered as a result of his whistleblowing activity.

*Id.* (quoting *Herster*, 72 F. Supp. 3d at 647). *See Hale*, 886 So.2d at 1216. Alternatively, an employee "must establish that (1) the employer 'violated the law through a prohibited workplace act or practice;' (2) the plaintiff advised the employer of the violation; (3) the plaintiff 'then refused to participate in the prohibited practice or threatened to disclose the practice;' and (4) the employer fired the plaintiff because of his 'refusal to participate in the unlawful practice or threat to disclose the practice.'" *Clark v. City of Alexandria*, 116 F. 4th 472, 485 (5th Cir. 2024) (quoting *Hale*, 886 So. 2d at 1216).

## IV. ANALYSIS

### A. Louisiana Worker's Compensation Act Exclusivity

First, the Court will address Defendant's argument that the Louisiana Worker's Compensation Act precludes Plaintiffs' claims against Lee's employer. (Doc. 40-2 at 14.) Admittedly, "[t]he Louisiana Worker's Compensation act is an employee's exclusive remedy *for work-related injuries*, precluding civil liability, except for injuries resulting from intentional acts." *Boswell*, 2015 WL 2406148 at *8 (W.D. La. Apr. 6, 2015) (citing La. R.S. 23:1032; *Horswill v. Louisville Ladder Corp.*, No. 14-3183, 1995 WL 517125, at *1 (E.D. La. Aug. 30, 1995)) (emphasis added). However, the LWCA's definitional provisions state that "'[i]njury' and 'personal injuries' include only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom." La. R.S. 23:1021(8)(a).

Plaintiffs do not seek damages for a work-related injury. (Doc. 21 at ¶ 36.) They seek damages for wrongful termination, retaliation, loss of consortium, loss of society, affection, and

assistance, and mental anguish. (*Id.* at ¶¶ 1, 27–30.) They further seek declaratory relief, back pay, front pay, and benefits. (*Id.* at ¶¶ 31–34.) Plaintiffs at no point seek damages for any work-related injury, and Defendant fails to point to any such claim for damages.

Because Plaintiffs' claims are not for the type of injuries provided for in the LWCA, the LWCA does not provide an exclusive remedy for these claims. Plaintiffs are therefore not precluded from seeking relief under the Louisiana Whistleblower Statute.

### B.    Plaintiffs' Louisiana Whistleblower Statute Claim

Next, the Court turns to the question of whether Plaintiffs have provided sufficient evidence to survive summary judgment on their Louisiana Whistleblower Statute claim. "To succeed on such a claim, the plaintiffs must establish that (1) the employer 'violated the law through a prohibited workplace act or practice;' (2) the plaintiff advised the employer of the violation; (3) the plaintiff 'then refused to participate in the prohibited practice or threatened to disclose the practice;' and (4) the employer fired the plaintiff because of his 'refusal to participate in the unlawful practice or threat to disclose the practice.'" *Clark*, 116 F. 4th at 485 (quoting *Hale*, 886 So. 2d at 1216).

Defendant argues that Plaintiffs have failed to show that any workplace act or practice did violate state law; that Lee informed Hood of any violation of state law; that Lee disclosed, threatened to disclose, or refused to participate in an illegal act; or that Lee was terminated as a result of such actions. (Doc. 40-2 at 15.) Defendant does not dispute that Lee was terminated from his employment on May 2, 2022, but it asserts that the basis for this termination was insubordination and job abandonment. (Doc. 40-2 at 9.)

16

Plaintiffs, on the other hand, contend that Hood alleged the violation of a number of state laws; that Lee informed Hood that the workplace was unsafe; that Lee refused to continue cleaning the mud tank because he felt it was unsafe; and that he was terminated for doing so.

a.      *Violation of State Law*

Plaintiffs claim that Hood was in violation of a number of state laws: La. R.S. 23:13, which requires that "[e]very employer shall furnish employment which shall be reasonably safe for the employees therein[;]" La. R.S. 14:34 and La. R.S. 14:35, which prohibit aggravated and simple battery, respectively; or alternatively, La. R.S. 14:36 and La. R.S. 14:37, which define and prohibit aggravated assault. (Doc. 21 at ¶ 24.) However, according to Lee himself, it was not Defendant Hood nor any of its employees who conducted the hydro-blasting that allegedly caused "metal debris and other projectiles to be shot at Mr. Lee at a very high and unsafe velocity[,]" (*id.*), but instead contractors from American Environmental. (Doc. 40-3 at 34, 36.) Plaintiffs have not, therefore, presented summary judgment evidence that Hood violated Louisiana's assault or battery laws.

Remaining, then, is the alleged violation of La. R.S. 23:13, which requires that "[e]very employer shall furnish employment which shall be reasonably safe for the employees therein." The statute clarifies that employers "shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees." La. R.S. 23:13. Federal and state courts have reiterated the duty imposed by the statute. *See McKnight v. Dresser, Inc.*, 676 F.3d 426, 433 (5th Cir. 2012) (collecting cases).

17

Defendant argues that the Louisiana Workers' Compensation Act bars Plaintiffs from bringing a complaint under La. R.S. 23:13. It is true that "[g]enerally, an employee's claim based on La. R.S. 23:13 would be under the Louisiana Workers' Compensation Act and not in tort." *Watters*, 15 So. 3d at 1141. However, in multiple cases, Louisiana appellate courts have reiterated that other claims—in those cases, tort claims related to workplace mold exposure—can be based on "the employer's breach of its duty to provide a safe workplace." *Id.* The instant case is no different. Plaintiffs seek to show a breach of the duty imposed by La. R.S. 23:13 not as a basis for a claim under 23:13 itself; instead, they seek to show that Defendant's violation of La. R.S. 23:13 forms the basis of their Louisiana Whistleblower Statute claim.

Crucially, then, Plaintiffs must show that Defendant was actually in violation of La. R.S. 23:13. Defendants interpret this requirement to mean that Plaintiff must have actually stated the law that Hood was violating at the time that Plaintiff protested the violation or refused to work. (Doc. 61 at 15.) However, the Fifth Circuit has explained the requirement to disclose a violation of state law as follows:

> [La. R.S.] § 23:967 protects employees who disclose or threaten to disclose an act or practice at their place of employment that violates of [sic] state law. To state a claim under [La. R.S.] § 23:967, a plaintiff must allege the violation of state law. Nowhere in his amended complaint does [the plaintiff] indicate which state law, if any, was violated by [the defendant] and therefore he fails to state a claim under [La. R.S.] § 23:967.

*Williams*, 2021 WL 1227873 at *9 (citing *Ware v. CLECO Power LLC*, 90 F. App'x 705, 709 (5th Cir. 2004) (citing *Puig v. Greater New Orleans Expressway Comm'n*, 00-924 (La. App. 5 Cir. 10/31/00), 772 So. 2d 842, 845; *Genella v. Renaissance Media*, 115 F. App'x 650, 652 (5th Cir. 2004)). Neither the Fifth Circuit nor this Court, however, have required that a plaintiff state the specific state law at issue at the time that the plaintiff raised the concern to the employer. *Id.*

18

Instead, in *Williams*, the Court dismissed the Louisiana Whistleblower Statute claim because "Plaintiffs failed to plead any specific violation of state law *in their Complaint*." *Id.* (emphasis added).

While Plaintiffs do not have to plead in their complaint the specific statute violated, they still must show that Hood *actually* violated state law in order to survive summary judgment for their Louisiana Whistleblower Statute claim. *Hale*, 886 So. 2d 1210, 1214; *see Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015). Plaintiffs must present evidence to show that Hood failed to "furnish and use safety devices and safeguards, [] adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and [] do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees." La. R.S. § 23:13. They have not done so.

Plaintiffs argue, broadly, that cleaning the mud storage tank, although "performed without issue for 11 consecutive prior years without issue, became unreasonably dangerous due to simultaneous hydroblasting occurring in the same area[.]" (Doc. 53 at 1.) Specifically, Plaintiffs argue that Lee was required to cross red danger tape in order to enter the mud storage tank, that he was provided with a pressure washer rather than a fire hose in order to clean the tank, and that while cleaning the tank, a steel pipe ruptured and ejected metal debris into Lee's workspace. (Doc. 53 at 1–4.) In addition, they argue that the safety rover, Michael Castillo, should have been consistently present rather than roving; that Lee's re-injury rendered the work unsafe; that the relative inexperience of Lee's co-worker, Braden Knight, made the task unsafe; that the caustic mud was inherently unsafe; that the lack of operable radio equipment available to Lee made the

work unsafe; and the fact that Lee was required to wear a harness in case of emergency made the work unsafe. (*Id.* at 2–3.)

The Court will turn momentarily to Plaintiffs' main arguments—that Plaintiff was required to cross the red danger tape and was exposed to metal debris as a result. However, the Court will first address Plaintiffs' other arguments.

First, Castillo's job as a safety rover, according to Plaintiff, "was to walk departments looking for unsafe acts or things that may have caused an accident or anything." (Doc. 40-3 at 22.) His patrol covered the entire pulp mill. (*Id.*) Plaintiffs' witness, Thomas Carter, another Hood employee, stated that a safety rover's job "is to go all over the middle." (Doc. 53-12 at 10.) Ryan Al-Marhoun, the mill supervisor, stated that a safety rover's "sole purpose is not to always be actively doing a task, but to make sure that we're following our safety procedures, and can be there as a person to come to if a safety issue were to arise because it's a large facility." (Doc. 40-8 at 19.) Castillo himself stated that as safety rover, he was "writing permits for contractors, just general safety, walking around, still doing our same procedures for the annual outage, lockouts, lockout/tagout, things like that." (Doc. 40-9 at 5.) Knight stated that a safety rover "made his rounds and done all of his permits he needed to be signed and done," and the safety rover was then able to go help with other tasks. (Doc. 40-11 at 7–8.) The safety rover's job, then, was not confined to one task at the mill. Lee argues that he never saw Castillo near the worksite on the morning of April 24, 2022, (Doc. 40-3 at 36), while Knight, who was the spotter outside of the tank, did see Castillo that morning, (Doc. 40-11 at 8). Plaintiffs have, then, raised a genuine question of material fact as to whether the safety rover was ever present near the mud tank on April 24, 2022, and whether his absence would create any safety issues.

Second, Lee's re-injury of a pre-existing injury does not render the workplace itself unreasonably unsafe: this is a reversal of alleged cause and effect.

Third, Knight had worked at Hood for approximately four months at the time of the incident. (Doc. 40-11 at 4.) Since turnarounds were an annual occurrence at Hood, this would have been his first turnaround and thus his first time cleaning the mud tank. (*Id.* at 5.) Knight stated that "they showed me what the process was, how to clean the mud tank." (*Id.*) Initially, his role was as a lookout or spotter watching Lee clean the tank. (*Id.*) After Lee left, Knight took a turn cleaning in the tank without any issues. (*Id.* at 8.) Plaintiffs have not presented any evidence that specific qualifications, training, or experience was needed to qualify an employee to clean the mud tank.

Fourth, Lee testified that during an outage, employees wore a specific kind of personal protective equipment ("PPE") called "wet suits. . . . made out of a plastic and rubber combination[,]" as well as rubber boots, all of which serves as "a complete barrier to prevent any liquid from . . . touching skin[.]" (Doc. 40-3 at 17.) He stated that Hood procured "all new PPE for us" during each turnaround. (*Id.*) Plaintiff testified that everyone involved in cleaning the mud tank would wear PPE. (*Id.* at 18.) He stated that despite this, the caustic mud did at times get on employees' skin, and employees would then have to dilute it with fresh water to prevent burns. (*Id.*) Plaintiff's allegation that the workplace was inherently unsafe due to the mud itself is undermined first by his assertion that he had done the same job for 11 years previously without any complaints as to the safety and second by the provision of full PPE to protect employees' skin.

Fifth, Lee testified that he did in fact "have a radio on site[,]" but that there was "too much water and chemicals circulating[]" in the mud tank to "hoist a radio" inside the tank. (Doc. 40-3 at 20.) Instead, his co-worker who acted as a "hole watch" or spotter "would leave it hanging on the I-beam by the entrance of the tank . . . . so everyone has access, you know, to the radio if you need

it." (*Id.*) According to Plaintiff's own testimony, then, Defendant provided radio equipment to Plaintiff.

Sixth, Lee testified that having a "lifeline" harness to allow his spotter to pull him out of the tank "in case something happens" was "OSHA standard." (*Id.*) Again, Lee's own testimony goes against his allegation that the harness contributed to an unsafe work environment.

The Court now turns to Plaintiff's main arguments. Distinct from his allegations about the red danger tape and the metal debris he was exposed to as a result, Plaintiff asserts that using a pressure washer rather than a fire hose made the work unsafe. (Doc. 53 at 1–2.) Knight testified that every time he has cleaned the tank—including on April 22, 2024—he had "a water hose in there, like a garden hose kind of deal, and then you have a pressure washer and then a fire hose." (Doc. 40-11 at 18.) Plaintiff acknowledged he has routinely been given a pressure washer to clean the tank for over five years, but that he doesn't feel it's needed if he has a fire hose instead. (Doc. 40-3 at 15, 18.) He noted that "either a fire hose or the pressure washer" can be used to cut past the mud in the tank, although he felt that a fire hose was more effective. (*Id.* at 18.) Plaintiff submitted no evidence that using a pressure washer, even exclusively a pressure washer, was dangerous. He did submit testimony from a coworker, Stephen Roberts, that on another incident, someone cleaning a tank lost consciousness due to fumes from a pressure washer. (Doc. 53-13 at 8.) However, Knight—the employee in question—stated that he did not lose consciousness but was "[j]ust dizzy[]" and "walked myself out." (Doc. 40-11 at 11.) He stated that this was due to "[p]oor spotting[,]" where the coworker outside failed to properly review the equipment logging "chemicals in the air that can hurt you." (*Id.*) This happened in 2023, after the events at issue. (*Id.*) Plaintiff has submitted no evidence connecting this to the use of the pressure washer. Plaintiff has

not presented evidence that using a pressure washer to clean the tank presented a danger, only testimony that it might be less effective than using a firehose.

The bulk of Plaintiffs' arguments that Hood violated La. R.S. 23:13 by failing to provide a safe workplace rest on the assertion that there was red tape blocking the entrance to the mud tank, that Lee was required to cross the red tape to clean the tank, and that he was subsequently exposed to metal debris due to a pipe blowout. (Doc. 53 at 1–2, 4.)

According to Plaintiffs, Lee was required to cross red danger tape put into place by the American Environmental contractor crew in order clean the mud tank, in the course of which, he was exposed to metal debris from a pipe that was blown out by American Environmental's hydroblasting. (Doc. 53 at 1–2, 4.) They present evidence of Hood's policy regarding red danger tape, which states that the "Red DANGER tape is used to warn of immediate or severe hazards[,]" and "[a]t all times possible . . . should not be crossed." (Doc. 53-8 at 8.) Although there is nothing in the policy stating that it is dangerous to be near an area marked off by the red danger tape, nor that there must be a buffer around the red danger tape, the barricade guideline areas do state that hazard tape should be used when there is overhead work being done, floor grating is open, or hoses are being used in high traffic areas, among other reasons. (*Id.* at 7.)

Defendant points to the statements not only from Hood employees but from American Environmental contractors that flatly contradict Lee's account of the events of April 24, 2022. Christopher Magee, a supervisor with American Environmental, testifies that he was present on April 24[1], (Doc. 40-4 at 4, 9); that the red danger tape did not include the mud tank that day, (*id.*

---

[1] Although Magee testifies that he was present on April 24, 2024, his name did not appear on the sign-in sheet for that day. (Doc. 40-4 at 9.) The same is true of John Wyatt. (Doc. 40-6 at 6–7.) It appears that the sign-in process for American Environmental employees at Hood was informal, with American Environmental contractors simply reporting their names to the security guard at Hood. (Doc. 40-4 at 8.) Both American Environmental supervisors appear to have been left off of the sign-in sheet. (*Id.* at 9; Doc. 40-6 at 6.) Plaintiffs do not dispute that they were present.

at 23–24); that the red tape never included the mud tank when he was the supervisor for the crew cleaning the mud filter room, (*id.* at 23–24); and that the American Environmental crew did not clean the drain line that would exit near the mud tank that day due to metal grating blocking the pipe, (*id.* at 12–13, 15).

Likewise, John Wyatt, another supervisor with American Environmental, testified that American Environmental always marked off the mud filter room and the area impacted by American Environmental's cleaning with red danger tape. (Doc. 40-6 at 5.) He stated that this red tape did not bar the mud tank, (*id.* at 24), and that the crew had no issues with anyone trying to cross the red tape on April 24, 2022, (*id.* at 6).

In addition to the American Environmental contractors, Hood employees who were present at the workplace testified that the red tape did not bar the entrance to the mud tank. Kyle Haygood, the foreman at the time of the incident in question, testified that "at the beginning of the shift, there was no barricade around—that would block them from going into the manhole, their entrance." (Doc. 40-10 at 14.) He testified that he believed there had been "some yellow tape in the area, but it was no red tape. . . . the manway was not blocked when I was back over—I thought it was yellow tape in the area." (*Id.* at 16.) He stated at the time Plaintiff started on the cleaning, the hydroblasters had not begun their cleaning. (*Id.* at 14.)

Knight, the other employee tasked with cleaning out the tank on April 24, 2022, testified that there was no red tape up when he and Lee arrived, but some was put up "beside us" while he and Lee were working. (Doc. 40-11 at 6.) Knight testified that no concerns were ever expressed to him by anyone, nor was he aware of any concerns, about their proximity to the red tape. (*Id.* at 6–7.) Knight stated that they could "go around" the red tape to enter the tank "from the outside." (*Id.* at 19.)

Plaintiffs, on the other hand, present testimony from two Hood employees who admit that they were not present on April 24, 2022. (Doc. 53-12 at 10–11; Doc. 53-13 at 7.) One of them, Thomas Carter, asserts that the red tape did block the entrance of the mud tank, but he admits that he did not see it on April 24, 2022. (Doc. 53-12 at 9.) The other, Roberts, testified that when he arrived for his shift after events in question, the red tape was not blocking the mud tank or the entrance to it. (Doc. 53-13 at 7.) Instead, he testified that the mud tank was "[n]ot directly inside of it, but it starts right there at the edge of . . . where you go in." (*Id.*)

Lee has raised a genuine dispute of material fact as to the presence and location of the red tape.

Finally, Plaintiffs have presented a genuine issue of material fact as to the alleged metal debris from a pipe blowout. Lee asserts that while he was cleaning the mud tank, a pipe blew out, "creating a hole at a 90-degree angle." (Doc. 53-8 at ¶ 14.) He claims that metal debris came shooting through this hole to hit the tank. (*Id.* at ¶¶ 15–16, 19.) Lee testified that this was outside of the tank. (Doc. 40-3 at 34.) Lee has additionally presented a photograph of a long diagonal pipe ending several feet about the ground outside. (Doc. 53-7.)

On the other hand, Defendant points to the testimony of Magee of American Environmental, who disputed that a pipe ever blew out, instead claiming that a pipe was blocked by metal grating, which caused American Environmental to stop work on that pipe until Hood cut the grating out. (Doc. 40-4 at 12–13, 15.) Wyatt of American Environmental also did not testify as to a pipe blowout. That said, Wyatt did acknowledge that they occasionally washed six- to eight-inch metal welding rods down the drains of the mud filter room, but he testified that the rods would merely fall to the ground outside of the mud filter room—within the area marked off by red danger tape. (Doc. 40-6 at 7–8.) He also testified that "about two" welding rods would have been washed

down the drain of the mud filter room during the 2022 turnaround, which was typical during a turnaround. (*Id.* at 19.) Wyatt testified that he never encountered any other pieces of metal while hydroblasting the mud filter room. (*Id.* at 7–8.) Al-Marhoun, Haygood, and Knight all did not recall a pipe blowout. (*See* Doc. 40-9 at 7; Doc. 40-10 at 14; Doc. 40-11 at 9.) Knight, who was acting as a spotter outside the mud tank, did not recall seeing any metal debris, whether due to a pipe blow out or otherwise. (Doc. 40-11 at 9.)

Plaintiffs have, therefore, raised a genuine issue of material fact as to whether there was any metal debris due to a problem with a pipe in the vicinity where Plaintiff was working.

There are, in addition, questions of fact as to where exactly the hydroblasters were working, whether it was any different than any other year, and whether it presented any safety issues. Lee claims that when he arrived, the hydroblasters were setting up to clean a sump tank about twenty-five to thirty feet away. (Doc. 40-3 at 25.) However, according to Lee, "[t]hey never started blasting inside the sump tank." (*Id.* at 29.) Instead, the American Environmental contractors were on a platform above the sump tank. (*Id.* at 29–30.) He testified that the American Environmental contractors then moved upstairs to clean the sewer drain and "the floor underneath the mud drum[]" instead. (*Id.* at 30.) According to Plaintiff, this was directly above the entrance to the mud tank. (*Id.* at 31.) Lee attests that it was this hydroblasting above him that led to the metal debris hitting the tank. (*Id.* at 33–36.) Magee, of American Environmental, testified that on April 24, 2022, he worked to clean the mud filter room. (Doc. 40-4 at 21.) He stated that none of the drains in the room ended near the mud tank. (*Id.*) He stated that he was cleaning the mud filter room at the same time that the mud tank was being cleaned, that this was what happened "every time[,]" and that he did not feel it posed any danger. (*Id.* at 23.) Wyatt, also of American Environmental, likewise testified that they cleaned the mud filter room on April 24, 2022. (Doc. 40-6 at 5.) Wyatt

26

stated that people were allowed to be in the mud tank while American Environmental hydroblasted the mud filter room. (*Id.* at 10.) He testified that in every one of the eight turnarounds he's worked at Hood, Hood employees have cleaned the mud tank at the same time that American Environmental contractors have hydroblasted the mud filter room. (*Id.* at 19.) Castillo testified that there were hydroblasters working on the other side of the plant while Plaintiff was cleaning the tank, but that Plaintiff was not in the tank while hydroblasters eventually began cleaning "above the tank." (Doc. 40-9 at 12.) He stated that he "made sure they were not pressure washing the tank at the same time the contractors were hydroblasting above the tank[,]" which he claims he did before lunch either by yelling to Plaintiff inside the tank or telling Knight to do so. (*Id.* at 12–13.) Haygood testified that at the time Plaintiff began cleaning the tank, the hydroblasters had not begun their cleaning. (Doc. 40-10 at 14.) When he returned after Plaintiff left, Haygood testified, "[t]here was a blasting rig—if I got my direction right—northwest of the manhole cover, the manhole where they entered the tank." (*Id.*) Plaintiff has, therefore, raised genuine questions of material fact as to whether there was hydroblasting in the vicinity of the mud tank at the time that he was working.

Drawing all reasonable inferences in favor of the nonmoving party, the Court concludes that Plaintiffs have raised a genuine issue of material fact as to whether the workplace was unsafe so as to create an actual violation of state law.

However, Plaintiffs must do more than this to survive summary judgment on a Louisiana Whistleblower Statute claim.

### b.    *Informing the Employer of the Violation*

To meet his summary judgment burden under the Louisiana Whistleblower Statute, Lee must also show that after informing his employer of the violation of state law, he either: disclosed

or threatened to disclose the violation of state law, participated in an investigation or inquiry into the violation of state law, or "[o]bject[ed] to or refuse[d] to participate in an employment act or practice that is in violation of law." La. R.S. 23:967. As to the first part of this, Lee has raised a genuine question of material fact as to whether he informed his employer, Hood, of his belief that the worksite was unsafe on April 24, 2022.

According to the majority of Defendants' witnesses, Lee left not because he felt unsafe but because he disliked the assigned work. Haygood testified that soon before lunch, Plaintiff approached him with his backpack and all his things. (Doc. 40-10 at 10.) According to Haygood, Plaintiff told him, "this is bullshit. I'm going home[,]" to which Haygood said "do what you got to do. You're—you're a grown man, or whatever basically." (*Id.*) Haygood testified that "Lee could have stopped work at anytime he deemed it unsafe." (*Id.* at 24.) He also stated that he did "not recall him mentioning anything about no shoulder injury." (*Id.* at 11.)

Michael Castillo, who was acting as Safety Rover on April 24, 2022, stated that Plaintiff "was pretty upset about having to clean the tank that day, but he never had to clean it out while the hydroblasters were working in that area." (Doc. 40-9 at 11.) He testified that "first thing in the morning," Lee was already "complaining about being there on his day off and having to clean out the mud storage tank, which is a job that the hydroblasters could do, but they make us do it instead." (*Id.*) He stated that Lee complained that it was "hot" and "dirty" cleaning out the tank. (*Id.*) Castillo stated that Lee never brought up any safety concerns to him, and that Castillo "made sure they were not pressure washing the tank at the same time the contractors were hydroblasting above the tank[,]" which he claims he did before lunch either by yelling to Plaintiff inside the tank or telling Knight to do so. (*Id.* at 12–13.)

28

Ryan Al-Marhoun, the supervisor, testified that when he was first told Lee had left his shift on April 24, 2022, he was told that "Mike was mad that he had to wash the mud tank, so he left." (Doc. 40-8 at 9.) When Al-Marhoun discussed this with another supervisor, Mike Castillo, he was told "that Mike Lee was aggravated that he was there on his day off, as stated as such, there to do grunt work/busy work, that should just be a hydroblasting job." (*Id.* at 10.) Al-Marhoun testified that when he discussed the incident with Haygood, Haygood informed him that when Plaintiff had spoken to him, "Mike had had his bags packed, had come over the pulp mill, and basically said, this is B.S. and I'm leaving." (*Id.* at 11.) Al-Marhoun testified that when he questioned Lee upon Lee's return to work, Lee "said, you know, this is B.S. that we're—I had to come in on my off day to do a job the hydroblasters could do." He testified that Lee's main argument was "it's kind of B.S., this is grunt work/busy work," and that the hydroblasters should clean it instead. (*Id.*) According to Al-Marhoun, the first time that safety concerns were brought up was in the text Lee sent after he was terminated on May 2, 2022. (*Id.* at 17.)

On the other hand, Knight testified testified that when Lee left on April 24, 2022, he stated that he was leaving because "he felt it was unsafe[,]" (Doc. 40-11 at 6), and that Lee stated "he felt it was unsafe, he was going home[]" before he left, (*id.* at 10). Likewise, Lee's text message to Al-Marhoun on April 29, 2022, references an earlier conversation and refers to "the safety hazard we were put in." (Doc. 53-10 at 3.)

Plaintiffs have therefore raised a genuine question of material fact as to whether Lee informed Hood of the alleged violation of state law prior to leaving the workplace.

> c.      *Protected Activity*

Next, Plaintiffs must show that "after advising the employer of the violation of law[,]" Lee either (1) disclosed or threatened to disclose the violation, (2) participated in an investigation into

the violation, or (3) "[o]bject[ed] to or refuse[d] to participate in an employment act or practice that is in violation of law." La. R.S. 23:967. Only the third of these is at issue here—Lee claims that he refused to participate in "unsafe" work, which he claims was in violation of La. R.S. 23:13. Plaintiffs raise questions of material fact as to whether Lee's refusal to continue to clean the mud tank was due to his belief that it was unsafe. Knight testified that Lee stated that he believed it was unsafe on April 24, 2022. (Doc. 40-11 at 10.) Knight did not testify that Lee was leaving due to a shoulder injury. (*Id.*) Lee also sent a text to Al-Marhoun referencing his belief that it was unsafe, although this was from April 29, 2022, rather than from the day of the events in question. (Doc. 53-10 at 3.) Although Lee's subjective belief that conditions were unsafe does not show an actual violation of La. R.S. 23:13, the Court accepts that Lee has raised genuine issues of material fact as to whether there was a violation of state law.

However, Lee's testimony on why he stopped work and left the worksite is contradictory. Lee testified that he informed Haygood that he was leaving because "I re-tweaked my shoulder and I felt that it was in my best interest to go home." (Doc. 40-3 at 39.) He stated that he informed Haygood of "what transpired back there . . . . about the unsafe condition and my shoulder." (*Id.*) When asked if he "gave Kyle [Haygood] an opportunity to assess the situation and put you in a better position[,]" Plaintiff responded "[m]y shoulder is injured so you want me to stay at work and work with an injured shoulder?" (*Id.* at 55.) He agreed that he "would have went home because of [his] shoulder[,]" (*id.* at 56), "regardless of what Kyle [Haygood] did[]" in response, (*id.* at 57.) Lee stated multiple times that when he informed Haygood that he was going home, "I let him know, Hey, I've re-tweaked my shoulder. So if I re-injured my shoulder, I'm no good to nobody. I can't do any more work." (*Id.* at 39.) Haygood testified that he did "not recall him mentioning anything about no shoulder injury." (Doc. 40-10 at 11.) Again, Knight testified that Lee stated he

was leaving because of unsafe conditions. (Doc. 40-11 at 10.) Given the limited number of people who heard Lee's reasons for leaving on April 22, 2024, and the contradictions between their statements, the Court acknowledges that there is a genuine issue of material fact as to why Lee left the worksite.

        *d.*      *Reprisal*

The Louisiana Whistleblower Statute prohibits reprisals "taken as a result of an action by the employee that is protected under Subsection A of this Section; however, nothing in this Section shall prohibit an employer from enforcing an established employment policy, procedure, or practice or exempt an employee from compliance with such." La. R.S. 23:967(C)(1). According to Plaintiffs, Lee was terminated because of his refusal to participate in work that he believed was unsafe. (Doc. 53 at 9.) Defendant, on the other hand, argues that Lee was terminated for insubordination (violation of company policy) and for leaving the worksite without permission (job abandonment). (Doc. 40-2 at 9; *see* Doc. 61-2 at 1.)

Multiple witnesses testified that Hood employees are permitted to stop work if they believe it is unsafe. (Doc. 40-10 at 24; Doc. 53-12 at 21.) However, there is a difference between stopping a given task and leaving the worksite altogether. According to Carter, employees had the right to refuse a specific assignment, but he clarified that this was "[n]ot leaving[.]" (Doc. 53-12 at 12.) Multiple Hood employees, including Plaintiffs' witness, testified that while there was not a formal process for requesting to leave in the middle of a shift, employees were not permitted to leave without the foreman or supervisor's permission. (*See* Doc. 40-10 at 21.) Carter stated "I don't think no business or corporation would allow any of their employees just to walk off a job without getting some type of permission from a foreman or a supervisor. . . . I don't think no job will allow anybody. That's just like no call, no show for a job. You know, that's automatic termination." (Doc.

53-12 at 12.) Likewise, Castillo stated that in order to leave work early, "I would need to ask permission." (Doc. 40-9 at 9.) Knight stated that "I would report to whoever the shift foreman was that there's a family emergency and I need to leave and . . . . [i]f it's a reasonable call, they'll usually work with you." (Doc. 40-11 at 12–13.)

There is no dispute that Plaintiff informed Haygood, his foreman, that he was leaving on April 24, 2022. (Doc. 40-10 at 20; Doc. 40-3 at 39, 56.) According to Plaintiff, Haygood said "Mike Lee, I cannot make you stay here." (Doc. 40-3 at 39.) In his deposition, Plaintiff agreed that he "would have went home because of [his] shoulder[,]" (*id.* at 56), "regardless of what Kyle [Haygood] did[]" in response, (*id.* at 57.) Plaintiff himself stated at the time that he was fired that he "can understand a suspension" for leaving the job. (*Id.* at 49.) Haygood states that he told Plaintiff that he could not make him stay, (Doc. 40-10 at 18), and that he was not going to physically stop Lee from leaving, (*id.* at 20.) Al-Marhoun testified that when he discussed the situation with Haygood, Haygood stated that he did not give Lee permission to leave but asked "what did you want me to do, wrestle him, keep him there? . . . basically I told him, Mike [Lee], I guess, you're going to do what you go to do." (Doc. 40-8 at 11.) According to Al-Marhoun, "telling Kyle [Haygood] you're leaving and getting permission to leave is not the same thing." (*Id.*)

In addition, Plaintiff states that when he and Al-Marhoun discussed the incident in a thirty-minute meeting on April 29, 2022, "it got racial in there[,]" with Lee accusing Al-Marhoun of "lies about a lot of things" and bringing up a "clique" he believed was allowed to get more overtime than other Hood employees. (Doc. 40-3 at 42–45.) He later described the conversation as "we had it out[.]" (*Id.* at 47.) Plaintiff was then terminated on May 1, 2022, for "Violation of company policy/Job Abandonment." (Doc. 61-2 at 1.)

Upon hire on June 22, 2010, Lee signed an acknowledgement of Hood policies that stated "[v]iolation of these rules could result in disciplinary action up to and including termination." (Doc. 61-1 at 25.) The list of possible conduct violations includes "Insubordination[]" and "Leaving the work area without proper authorization or proper relief." (*Id.* at 26.) An investigation undertaken through the United States Department of Labor under OSHA found that "the evidence demonstrates that Respondent terminated your employment because you walked off the job on April 24, 2022; not for engaging in safety and health protected activity." (*Id.* at 41.)

Although the Court draws all reasonable inferences in favor of the non-moving party at the summary judgment stage, Defendant has shown a legitimate non-retaliatory reason for terminating Lee: according to Defendant, Lee left the work area without proper authorization or permission. (Doc. 61-2 at 1.) Lee himself admits that a suspension would have been warranted, indicating that his dispute is not with being disciplined for leaving the worksite but with the severity of the discipline. (Doc. 40-3 at 49.) Plaintiffs briefly assert that "Hood's proffered reasons for terminating Mr. Lee—alleged insubordination and job abandonment—are clearly false and pretextual." (Doc 53 at 17.) In support of this argument, they claim that "Defendant's shifting explanations—from 'insubordination' to 'job abandonment'—further undermine the legitimacy of its stated reasons for termination." (*Id.*) However, Defendant consistently stated that Lee was being terminated for job abandonment. Lee stated that at one point, a representative from Hood's human resources referenced both job abandonment and insubordination, which was a violation of company policies, as a cause for termination. (*See* Doc. 40-3 at 47.) The Separation Notice lists both violation of company policy and job abandonment as causes for termination. (Doc. 61-2 at 1.) Plaintiffs have presented no other basis for their claim that the termination was pretextual.

The Louisiana Whistleblower Statute explicitly states that "nothing in this Section shall prohibit an employer from enforcing an established employment policy, procedure, or practice or exempt an employee from compliance with such." La. R.S. 23:967(C)(1). Hood employees were not allowed to leave the worksite without proper authorization; Lee had signed an acknowledgement of this policy. (Doc. 61-1 at 26.) Lee had the right to refuse to participate in employment practices that violated state law; such refusal is protected by the Louisiana Whistleblower Statute. La. R.S. 23:967. He did not, however, have the right to leave Hood altogether without permission from his supervisor. While Plaintiff argues that his foreman's statement that "I cannot make you stay here" amounts to permission to leave, (Doc. 53 at 15), he also admits that his conduct warranted a suspension, (Doc. 40-3 at 49). Defendant has shown a legitimate reason for the termination—the enforcement of an established employment policy. Plaintiff has not presented any evidence to dispute this or show pretext, and has in fact admitted that his actions warranted disciplinary action.

Because Plaintiff's termination was pursuant to Defendant "enforcing an established employment policy," Plaintiffs have not shown a violation of the Louisiana Whistleblower Statute.

## C.    Remaining Claims

Plaintiffs' remaining claims are for "loss of consortium, loss of society, affection, and assistance." (Doc. 21 at 8.) "In Louisiana, damages for loss of consortium, service, and society are compensable under the same cause of action." *Sanchez v. Anco Insulations, Inc.*, 2021 WL 1564575 at *3 (E.D. La. Apr. 21, 2021) (citing *Ferrell v. Fireman's Fund Ins.*, 96-3028 (La. 7/1/97), 696 So. 2d 569, 574 (citing La. Civ. Code. Ann. art. 2315(B)); *Bellard v. South Central Bell Telephone Co.*, 96-1426 (La. App. 3 Cir. 8/27/97), 702 So. 2d 695, 707). This cause of action "'includes love and affection, society and companionship, sexual relations, the right of

performance of material services, the right of support, aid, and assistance, and felicity.'" *Id.* (quoting *Bellard*, 702 So. 2d at 707). "A loss of consortium claim is a derivative claim and cannot be maintained if the primary claim is not viable as a matter of law." *Williams*, 2021 WL 1227873 at *13 (citing *Ferrell*, 696 So. 2d at 576; *Salard v. Lowe's Home Ctrs., Inc.*, 904 F. Supp. 569, 572–73 (W.D. La. 1995)).

The Court has found that Plaintiffs' Louisiana Whistleblower Statute claim is not viable as a matter of law. Consequently, Plaintiffs cannot assert a claim for loss of consortium, society, affection, and assistance.

## V.     CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 40) filed by Defendant Hood Container of Louisiana, LLC, is **GRANTED**. Plaintiffs Michael Lee and Susan Broadway Lee have failed to meet their summary judgment burden on their claim for relief under the Louisiana Whistleblower Statute; this claim and their derivative claims for loss of consortium, society, affection, and assistance are therefore dismissed. Plaintiffs' *First Amended Complaint* (Doc. 21) is **DISMISSED**.

Signed in Baton Rouge, Louisiana, on <u>September 5, 2025</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**